**N. W. CONTROLS, INC., a Pennsylvania corporation, Plaintiff,**

v.

**OUTBOARD MARINE CORPORATION,**
a Delaware corporation, Defendant.

Civ. A. No. 3730.

United States District Court,
D. Delaware.

Oct. 6, 1970.

Brereton Sturtevant, of Connolly, Bove & Lodge, Wilmington, Del., and Thomas L. Cantrell and John T. Synnestvedt, of Synnestvedt & Lechner, Philadelphia, Pa., of counsel, for plaintiff.

James M. Tunnell, Jr., and William O. LaMotte, III, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., and Butzel, Levin, Winston & Quint, Detroit, Mich., of counsel, for defendant.

## OPINION

LATCHUM, District Judge.

Plaintiff in this case has moved for a preliminary injunction enjoining the defendant from requiring certificates, issued to the purchasers of the defendant's outboard motors, to be redeemed exclusively for remote control throttle cables. In addition the plaintiff seeks to enjoin the defendant from disparaging the plaintiff's products in violation of the anti-trust laws. The plaintiff also moved, in a subsequent oral modification of its application, to require the defendant to cease issuing certificates to purchasers of at least one of the horsepower sizes of its 1971 model outboard engines now under the certificate program.

This action is a civil antitrust action brought by N. W. Controls, Inc. ("N. W.") against Outboard Marine Corporation ("O.M.C."). N.W. is a manufacturer of remote control cables and end fittings for outboard and stern drive boat engines and snowmobiles. O.M.C. is a diversified corporation which manufac-

tures and distributes lawn mowers, golf carts, industrial vehicles, chain saws, snowmobiles, and camping trailers in addition to outboard and stern drive boat motors and accessories, including remote control cables.

The plaintiff, N.W., has alleged violations of Section 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1, Section 3 of the Robinson-Patman Act, 15 U.S.C. § 13a, and Section 3 of the Clayton Act, 15 U.S.C. § 14. Suit has been brought pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15, requesting treble damages for the violations. Both temporary and permanent injunctive relief have been requested pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. This Court has jurisdiction under 28 U.S.C. § 1337. The defendant, O.M.C., is a Delaware corporation. Venue is thus properly laid in this district under 28 U.S.C. § 1391, 15 U.S.C. § 15 and 15 U.S.C. § 22.

Plaintiff alleges that O.M.C. has been violating Section 3 of the Clayton Act, 15 U.S.C. § 14, and Section 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1, by "tying" the sale of its brand of outboard motor remote control throttle cables to the sale of its electric gear shift equipped outboard motors by means of a "certificate program."[1]

Outboard motors, such as those manufactured by the defendant, are mounted on a transom at the rear of small boats. The gear shift and throttle controls may be located on the engine itself and the operator may control the boat and motor seated at the rear of the boat next to the motor. Frequently, especially when outboard motors of higher horsepower are used, control operations, steering, gear shifting, and throttling, are performed from a position further forward in the boat using control cables. These control cables are elongated flexible conduits containing freely moving core wires and have specially configured end fittings which are attached to the appropriate fittings at the engine and at the control station.

In terms of the engine operation two control functions may be performed by means of remote control cables, gear shifting and throttle operation. Traditionally this was accomplished by running two control cables, one for the shift and one for the throttle, to a control box containing two levers, one for operating the gear shift and one for operating the throttle.

However, in the 1962 model year, which began in the fall of 1961, O.M.C. introduced the first outboard engine with electrically operated gear shift. For these engines the remote control operation of the shift is accomplished by means of an electric clutch and harness connected to electric push buttons or other controls. The throttle, however, is still operated by means of a remote control cable connected to a single lever on the control box. It is these models which are under the "certificate program" complained about in the present case. None of the defendant's models equipped with mechanical gear shifts are under the "certificate program."

The certificate program works rather simply. The purchaser of one of the defendant's Evinrude or Johnson outboard motors[2] equipped with an electric gear

---

1. Although the complaint also alleges that the defendant is involved in an illegal tying procedure in regard to its stern drive engines, no injunctive relief in that regard has been requested at this time.

2. With one slight variation the motors in the two lines are virtually identical except for exterior trim and markings. Johnson in 1971 has eleven different horsepower sizes, 125, 100, 60, 50, 40, 25, 20, 9½, 6, 4, and 2 horsepower.

Evinrude has the same eleven horsepower sizes except it has an 18 horsepower engine instead of a 20. Both parties seem in agreement that remote control cables are most likely to be used with engines above the 9½ horsepower size. Of the seven horsepower sizes in the range above 9½, four are in the certificate program, the 125, 100, 60, and 50 horsepower models.

shift receives, with the motor itself, a control box, an electric shift wiring harness, and a certificate which the purchaser may redeem for the proper length throttle control cable, the length being dependent upon the size of the boat. Upon presentation of the certificate the purchaser obtains a control cable without additional charge. The cost of the throttle control cable is thus included in the cost of the motor. Exhibits filed in this case indicate that over ninety percent of the certificates are redeemed for the "free" cables.[3]

These certificates are turned in by the dealer to O.M.C.'s Gale Products division for credit toward the purchase of cables to replenish the dealer's inventory. The dealer may not redeem these certificates for cash or for credit on any O.M.C. product except control cables.

On August 4, 1970 the plaintiff moved for a preliminary injunction to restrain the defendant from expanding the proportion of its models under the certificate program beyond the proportion covered in the 1970 model year. At a hearing held on September 10, 1970, the plaintiff learned for the first time that the defendant's 1971 models had already been released for sale. As a result of the elimination of the 33 horsepower size,[4] one not under the certificate program, the plaintiff alleged that the proportion of illegal interference had increased in the potential market for remote control cables.[5] Thus at a second hearing held on September 18, 1970, the plaintiff modified its requested relief to ask that the defendant be required to cease the use of the certificate program with respect to one horsepower size of its 1971 engines in order to maintain the status quo.

Plaintiff's modified motion for a preliminary injunction also requested that the defendant be ordered to accept any certificates tendered by its dealers for cash or for credit to the dealer toward the purchase of any O.M.C. accessory or product and not just for throttle control cables. In addition the plaintiff requested the Court to order the defendant to refrain from issuing or publishing any statement or report critical of the quality or performance of the plaintiff's products.

Plaintiff contends that the changes made by the defendant in its product line for the 1971 model year constitutes

---

3. See deposition of Sherwood L. Richardson dated August 11, 1970, page 53 and plaintiff's exhibit 10, a memo from G. M. Hornbeck, O. M. C.'s director of accounting, to Mr. Richardson.

4. In 1971 the horsepower of several models was increased. As pointed out in note 2, supra, both Evinrude and Johnson, with one exception, have identically corresponding horsepower sizes. All changes were made in the parallel horsepower sizes of both lines. What in 1970 had been the 115 horsepower size became 125 horsepower, the 85 horsepower became 100 horsepower, and the 1½ horsepower size became 2 horsepower. A new 50 horsepower size, equipped with an electric gear shift, was added to both the Evinrude and Johnson lines. Being equipped with an electric shift, this new size is under the certificate program. However, at the same time, the 40 horsepower size, which had been available either with electric gear shift (under the certificate program) or with mechanical gear shift (not under the certificate program), was made avail-

able only with a mechanical shift. Thus the number of horsepower sizes under the certificate program remained at four.

5. As pointed out in note 2, supra, remote control cables are most likely to be used with engines above the 9½ horsepower size. Of the seven horsepower sizes above this range in the 1970 model year, three were available only with electric shift and were thus under the certificate program, three were available only with mechanical shift and were thus not under the certificate program, and one, the 40 horsepower size, was available with either electric shift or mechanical shift and was either under or not under the certificate program depending upon the shift selected by the purchaser of the engine. Of the seven horsepower sizes in this range in the 1971 model year, four are available only with electric shift and are thus under the certificate program and three are available only with mechanical shift and are thus not under the certificate program. None offer an option.

an extension of its illegal practices and a change in the status quo calling for injunctive relief. The plaintiff argues that the continuation of the certificate program into the 1971 model year will cause it irreparable injury because the opening of the model year establishes the sales trend for the entire year.[6] In addition the plaintiff asserts that damages could not be accurately measured for the monetary loss sustained from its foreclosure from this substantial market.

The defendant contends that the plaintiff has failed to show that it will suffer irreparable harm if the preliminary relief is not granted and that, if the plaintiff prevails at the trial on the merits, an award of money damages will be adequate to compensate the plaintiff for any injury which it might have suffered. The defendant further contends that the damage to it which would result from the granting of a preliminary injunction would vastly outweigh the harm to the plaintiff which would be averted. The defendant contends that no evidence exists that it will attempt to disparage the plaintiff's products, so that any injunctive relief on this subject would be superfluous.

■ In order to justify the issuance of a preliminary injunction certain prerequisites must exist. The fact that violations of the antitrust laws have been alleged does not displace the normal rules of equity. Kay Instrument Sales Co. v. Haldex Aktiebolag, 296 F. Supp. 578 (S.D.N.Y.1968). The law of this circuit and district is well settled as to the showing which is required before a preliminary injunction will issue. A preliminary injunction will issue only "in a case clearly demanding it" and only "to preserve the status quo pendente lite." Warner Bros. Pictures, Inc. v. Gittone, 110 F.2d 292, 293 (C.A. 3, 1940).

■■ In this district temporary injunctive relief must be denied unless the moving party can demonstrate (1) that there is no serious dispute between the parties as to the facts alleged or the law applicable, (2) that there is a reasonable probability of the moving party's success at final hearing, (3) that irreparable injury will result to the moving party, for which there is no adequate remedy at law, unless the relief is granted, (4) that the moving party will suffer more severe injury if the relief is denied than the other party will suffer if the relief is granted. Henis v. Compania Agricola De Guatemala, 116 F.Supp. 223 (D.Del.1953), aff'd 210 F.2d 950 (C.A. 3, 1954); American Smelting and Refining Co. v. Pennzoil United, Inc., 295 F. Supp. 149 (D.Del.1969); Wilmington City Ry. Co. v. Taylor, 198 F. 159 (D. Del.1912); see also 78 Harv.L.Rev. 994, 1056 (1965). The moving party, the plaintiff in this case, has the burden of showing that he is entitled to the injunctive relief requested. Garlock, Inc. v. United Seal, Inc., 404 F.2d 256 (C.A. 6, 1968). The issuance of preliminary injunctive relief rests in the sound discretion of the trial court. United States v. Ingersoll-Rand Co., 320 F.2d 509 (C. A. 3, 1963).

■■ The party seeking a preliminary injunction to restrain acts claimed to be in violation of the Clayton Act and the Sherman Anti-Trust Act must allege only facts as to which there is no serious dispute and must demonstrate a reasonable likelihood of success. Vanadium Corp. of America v. Susquehanna Corp., 203 F.Supp. 686 (D.Del.1962); Dallas v. Atlantic Refining Co., 189 F.Supp. 815 (D.Del.1960). Where there are complex or novel issues of law and fact whose resolution is in doubt, a preliminary injuction should be denied. Instant Delivery Corp. v. City Stores Co. (Lit Bros.Div.), 284 F.Supp. 941 (E.D. Pa. 1968); Dalmo Sales Co. v. Tysons Corner Regional Shopping Center, 308 F.Supp 988 (D.D.C. 1970).

6. The opening of the sales season is alleged by the plaintiff to be the annual trade show which opened this year on September 25 in Detroit.

In the present case the facts as to the actual operation of the defendant's certificate program do not appear to be in doubt. However, sharp disputes exist as to the motivation behind the establishment of the program. The defendant has admitted that the certificate program virtually forces the purchaser of one of its electric shift Evinrude or Johnson engines to use an O.M.C. throttle control cable, but it insists that this is necessary to insure the use of a high quality control cable in order to prevent possible motor damage and to protect the reputation of its products. The defendant also contends that because the engines cannot be operated except by the use of a throttle control cable, the engine and cable are all one product and not two.

The plaintiff alleges that the motivation behind the certificate program was to increase cable sales, a likely result of this "tying" process. In addition the plaintiff denies that the electric shift engines and control cables are one product. The plaintiff denies that a control cable must be used to operate the throttle and alleges that it manufactures a device which can be used on such engines in place of the control cable.

The Court is thus faced with conflicting factual claims and inferences which should await a trial on the merits for resolution. Since the outcome of this case will depend in large measure on how the complex factual and legal questions presented by the conflicting affidavits and statements filed are resolved, this Court concludes that on the present record serious conflicts of both a factual and legal nature exist and that neither party has shown a reasonable probability of success at final hearing.

■■ In an antitrust case brought under the Clayton Act or Sherman Anti-Trust Act the party requesting a preliminary injunction must show that unless such relief is granted irreparable harm will result for which there is no adequate remedy at law. Dallas v. Atlantic Refining Co., supra; Allis-Chalmers Mfg. Co. v. White Consolidated Industreis, Inc., 414 F.2d 506 (C.A. 3, 1969), cert. den. 396 U.S. 1009, 90 S.Ct. 567, 24 L.Ed.2d 501 (1970).

■■ An analysis of the affidavits, briefs, and supporting papers filed in this suit indicates that the major relief sought is a judgment for money damages caused by the alleged foreclosure of the plaintiff from the market for remote control throttle cables for the defendant's electric shift outboard motors. No reason has been advanced other than the bare assertions of the plaintiff, why this Court cannot devise a just formula for the proper award of damages if the plaintiff should prevail on the merits. There has been no allegation that the failure to grant the temporary relief asked for will result in the destruction of the plaintiff's business. Where the economic loss involved would be so great as to threaten destruction of the moving party's business, a preliminary injunction should be issued to maintain the status quo. Poster Exchange, Inc. v. National Screen Service Corp., 198 F.Supp. 557 (N.D.Ga. 1961), aff'd 305 F.2d 647 (C.A. 5, 1962); Greenspun v. McCarran, 105 F.Supp. 662 (D.Nev. 1952). However, where the loss, as in this case, may be ascertained in money damages, no irreparable injury is shown and refusal to grant a preliminary injunction is proper. Graham v. Triangle Publications, Inc., 344 F.2d 775 (C.A. 3, 1965).

■ In considering the irreparable nature of the injury which may result from denial of preliminary relief the Court can consider whether the plaintiff will get an early trial on the merits. Volk v. Loew's Inc., 94 F.Supp. 162 (D. Minn. 1950); see also Virginia Airmotive, Ltd. v. Canair Corp., 393 F.2d 126 (C.A. 4, 1968). In the present case the Court notes that, honoring the desires of both parties, trial has been set to commence on January 6, 1971, less than three months from now. The short duration of time remaining before the trial also appears to militate against a finding of irreparable injury to the plaintiff

from a denial of injunctive relief at this time.

A case presenting more persuasive evidence than has been presented in the present case in which preliminary injunctive relief was denied is Automatic Radio Mfg. Co. v. Ford Motor Company, 272 F.Supp. 744 (D.Mass. 1967), aff'd 390 F.2d 113 (C.A. 1, 1968), cert. den. 391 U.S. 914, 88 S.Ct. 1807, 20 L.Ed.2d 653 (1968). In dispute was an alleged illegal tying arrangement. In that case the plaintiff, a manufacturer of custom automobile radios, requested a preliminary injunction ordering the defendant, Ford, a major manufacturer of motor vehicles, to supply any of its dealers, who so requested, models of its automobiles with dashboards perforated for radio installation. Ford had adopted a program of supplying only solid dashboards on models not equipped with a factory installed radio. The Court in the *Automatic Radio* case noted the extension of the dashboard covers to other models, the increase in the plaintiff's monetary losses and the bankruptcy of one of the other competitors in the field. In spite of this the Court found that money damages would adequately compensate the plaintiff for any loss of sales or good will caused by any illegal conduct of the defendant. For this reason no irreparable injury was found and no preliminary injunction was granted.

■■■ The present case has produced less cogent reasons why injunctive relief should be granted at this time. Because any loss of profits caused by the defendant's certificate program may be recovered in this action and because no showing has been made that the plaintiff's business will be in danger of being destroyed before trial on the merits, this Court holds that the plaintiff has failed to demonstrate that irreparable injury, justifying the issuance of a preliminary injunction, has been shown.

■■■ In addition to the reasons stated *supra* the Court finds additional reasons why the defendant should not be ordered to cease the use of the certificate program with one horsepower size of its engines at this time. A preliminary injunction should only issue for the purpose of preserving the status quo and not for the purpose of placing either party in a more favorable or less favorable position. Warner Bros. Pictures, Inc. v. Gittone, supra; American Mercury, Inc. v. Kiely, 19 F.2d 295 (C.A. 2, 1927). The plaintiff contends that the operation of the certificate program for the 1971 model year has altered the status quo by foreclosing from it an additional percentage of the market from that of the 1970 and previous model years. However, four horsepower sizes were under the certificate program in the 1970 model year and four are under the progam in the 1971 model year. What appears to have occurred in the 1971 model year is that by virtue of the electric shift option being eliminated on the 40 horsepower size, the certificate program ceased as to that size engine. At the same time a new 50 horsepower engine, under the certificate program, was added to the defendant's lines and the 33 horsepower engine, not under the certificate program, was dropped. While this may have altered the status quo between the parties to some degree, the Court does not believe that the relief requested, ordering the defendant to remove one size engine from the certificate program, should be granted. The effect of such an order would be that four engines would then be completely outside of the certificate program. The Court is not satisfied that requiring the certificate program to be terminated with respect to one horsepower size would maintain the status quo. Such relief appears to go beyond that.

As to enjoining the defendant from disparaging the plaintiff's products, this Court also finds it unnecessary to enter such an order at this time. In addition to the finding that no irreparable harm has been shown, discussed *supra*, other factors militate against granting such relief on this claim.

In order for conduct alleged to be in violation of the antitrust laws to be enjoined there must be "something more than the mere possibility" it will occur. United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953). If disparagement of the plaintiff's products is shown and if it is shown to be for the purpose of restraining trade in violation of the antitrust laws, then injunctive relief might be available in a final decree after the trial on the merits. See Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

However, in the present case the record is devoid of a showing that the defendant has criticized or disparaged the plaintiff's control cables in the past. Nor has the plaintiff been able to specify any reasonable basis for believing that such conduct will occur in the future. It has been established in this circuit that even when a strong case of future conduct justifying injunctive relief is made out, no injunction should be granted until the conduct complained of actually occurs. Holiday Inns of America, Inc. v. B & B Corporation, 409 F.2d 614 (C.A. 3, 1969). "A court of equity does not enjoin an act which is not about to take place." Clifton Park Manor, Section One v. Mason, 137 F.Supp. 324, 325 (D.Del.1955). If and when the defendant conducts a campaign to disparage the plaintiff's products in violation of the antitrust laws, application may be made to this Court for such relief, if any, as may be justified in the circumstances. On the present record no such relief will be granted at this time.

Therefore, for the reasons stated, the plaintiff's motion for a preliminary injunction will be denied.

The above shall constitute the findings of fact and conclusions of law as required by Rule 52(a), F.R.Civ.P.

Submit order in accordance with this opinion.