**Louis J. GIULIANO et al., Plaintiffs,**

v.

**TOWN OF EDGARTOWN et al., Defendants.**

Civ. A. No. 81–2868–G.

United States District Court, D. Massachusetts.

Feb. 8, 1982.

James P. Hayes, Robert J. Owens Associates, P. C., Marshall D. Stein, Peter D. Feeherry, Hale, Sanderson, Byrnes & Morton, Boston, Mass., for plaintiffs.

Carl Valvo, Asst. Atty. Gen., Boston, Mass., Richard McCarron, Edgartown, Martha's Vineyard, Mass., for defendants.

## MEMORANDUM OF DECISION DENYING PRELIMINARY INJUNCTION

GARRITY, District Judge.

This is an action under 42 U.S.C. § 1983 brought by two real estate developers, Louis Giuliano and Patricia Lett, against the Town of Edgartown and members of the Edgartown Planning Board and Zoning Board of Appeals. The gist of plaintiffs' complaint is that the defendants' application of Article XI, § 11.1 of Edgartown's Zoning By-laws to property owned by them violated their right to substantive due process under the Fourteenth Amendment and constituted a taking without just compensation in violation of the Fifth and Fourteenth amendments.

The case is presently before this court on plaintiffs' motion for a preliminary injunction, filed on November 19, 1981. The background facts to the plaintiffs' motion are as follows. The defendant Edgartown is a rural town of approximately 30 square miles on the island of Martha's Vineyard. It has a year-round population of approximately 2,500 and a peak summer population of approximately 13,500. In 1980, the town voted to amend its zoning by-laws to add Article XI, Section 11.1 which, in pertinent part, provides:

11.1 Subdivision of Lots. Whenever a new lot or lots is or are formed from a part of any other lot or lots, the assembly or separation shall be effected in such a manner as not to impair any of the requirements of this by-law and shall be in accordance with the Subdivision Regulations of the Town of Edgartown.

a. The subdivision of a parcel or adjacent parcels in any district shall not exceed ten lots if resulting from division or combination of properties which were in the same ownership and contiguous as of the date of first publication of notice of Public Hearing on this By-Law in any 12 month period. This provision shall apply to all subdivisions within the Town even if approval under the Subdivision Control Law is not required.

b. Subdivisions in excess of ten lots may be allowed without special permit of the Planning Board provided the owner thereof covenants with the Planning Board that he will not convey or build upon more than ten lots in any twelve month period. The covenant shall identify the lots that may be conveyed or built upon in each twelve month period.

c. Subdivisions in excess of ten (10) lots may be allowed by Special Permit after notice and hearing before the Planning Board provided that the Board determines that the probable benefits to the Town outweigh the probable adverse effects resulting from granting such permit. The Planning Board shall consider the impact on schools, other public facilities, traffic and pedestrian travel, the availability of public water and sewer, recreational facilities, open spaces and agricultural resources, traffic hazards, preservation of unique natural features, planned rate of development, and housing for senior citizens and people of moderate income.

In 1981, plaintiff Giuliano applied to the Edgartown Planning Board ("Board") for a special permit under Article XI, § 11.1(c) to subdivide his 80 acre parcel of land located off the Edgartown-West Tisbury Highway into 59 lots during a single year. A public hearing was held on plaintiff's application

on May 28, 1981 and on July 1, 1981 the Board voted to deny the special permit. As grounds for its decision, the Board stated:

> . . . it is evident that the probable adverse effects resulting from the granting of such a special permit for a 59 lot subdivision will outweigh the probable benefits to the Town. This is true in terms of:
>
> 1. Services such as school, police and fire demanded by the potential increase in population.
>
> 2. Increased town personnel needed to service those demands and perform the general business of the town (such as Planning Board, Assessors, Board of Health, Highway Dept., etc.)
>
> 3. Increased strain placed upon already overcrowded recreational facilities and marine and shellfish facilities.
>
> 4. Lack of adequate provision for low to moderate income lots.[1]

Giuliano filed an appeal from the Planning Board's decision to the Edgartown Zoning Board of Appeals ("Board of Appeals") on July 21, 1981. While this appeal was pending, he sold his entire 80 acre parcel at a purchase price of $65,000. to plaintiff Patricia Lett. On August 19, 1981, the Appeals Board held a public hearing to determine whether the Planning Board's decision denying Giuliano's application for a special permit should be reversed. The record of that hearing indicates there was considerable discussion of Giuliano's proposed subdivision as well as the need to control growth and conveyancing in the town. Plaintiff Giuliano's legal counsel, Mr. Hayes, told the Board that his client knew "how the town feels about control of planned growth," so he had submitted a proposal for cluster subdivision approval, hoping to have the 10 lot restriction on subdivision development waived. Mr. Hayes also suggested that if the Planning Board felt the disadvantages of the pro-

posed subdivision outweighed its benefits, it never should have approved Giuliano's plan for cluster development. Thereafter, Mr. Hayes "suggested the best compromise would be to *control growth by permitting the sale of more than 10 lots but not allowing more than 10 building permits to be issued.*" Record of Proceedings, Appendix D to Plaintiffs' Motion for a Preliminary Injunction, p. 3 (emphasis in original). A member of the Board pointed out that there was nothing in Mr. Giuliano's application regarding the limitation of building permits. Mr. Hayes responded that "technically (plaintiff Giuliano) was appealing the Planning Board decision but that a proviso could be added." *Id.* at p. 3. Another board member then asked if Giuliano was "basically requesting a permit for blanket selling" and Mr. Hayes indicated that he was. *Id.* at 4.

At the end of the hearing, the Zoning Board of Appeals voted unanimously to uphold the Planning Board's decision denying Mr. Giuliano a special permit. It stated as the ground for its decision that the probable benefits of the proposed subdivision did not outweigh its probable adverse effects.

On November 10, 1981, Mr. Giuliano and Ms. Lett commenced this suit, seeking an order declaring the Town's application of Section 11.1 to the land formerly owned by Mr. Giuliano unconstitutional, an injunction against its enforcement, and an award of $1,500,000 in damages. On January 13, 1982, five days after the hearing on their motion, they filed a substitute motion for a preliminary injunction "restraining the defendants from denying a special permit to sell more than 10 lots and restraining the defendants from relying upon this said ten lot sales limit as a basis for refusing to approve a final subdivision plan to be submitted by the plaintiffs so long as such sale contains in the deed the earliest date in [sic] which construction may be commenced in

---

1. During the same meeting, the Planning Board voted to grant a special permit to Mr. Giuliano under Article 12 of the Edgartown Zoning By-

law excepting the same 80 acre parcel of land from the By-law's intensity regulations and allowing cluster development thereon.

conformity with Edgartown Zoning By-law, Article 11." [2]

In order to grant the preliminary injunction requested, this court must find: (1) that plaintiffs will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendants; (3) that plaintiffs have exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction. *Planned Parenthood League of Mass. v. Bellotti*, 1 Cir. 1981, 641 F.2d 1006, 1009, quoting from *Women's Community Health Center, Inc. v. Cohen*, D.Me.1979, 477 F.Supp. 542, 544. Plaintiffs have the burden of showing that all four of these prerequisites for a preliminary injunction are met in this case. For the reasons stated below, we find that they have demonstrated neither a likelihood of success on the merits nor an irreparable injury. Accordingly, we deny their motion for a preliminary injunction.

## I Success on the Merits

Plaintiffs do not claim that defendants exceeded their authority under the Massachusetts Zoning Enabling Act, M.G.L. c. 40A, § 1 et seq., in denying plaintiff Giuliano's application for a special permit under Article XI, section 11.1.[3] Nor do they argue that the by-law is unconstitutional on its face. Rather, they contend that defendants' application of section 11.1(c)'s limitation on how many lots in a subdivision may be *sold*, as opposed to *built upon*, in a single year amounted to a violation of their right to due process under the Fourteenth Amendment and a taking without just compensation in violation of the Fifth and Fourteenth Amendments.

### A. The Due Process Claim

■ In evaluating plaintiffs' chances of succeeding on the merits of their due process claim, we begin by observing that plaintiffs bear a heavy burden of proof. Since this case involves no claim of infringement of a fundamental right, our review of the municipal action in question is extremely limited. When an individual contends that a local board has unconstitutionally applied a zoning ordinance to his property, a federal court is not entitled to review the evidence and reverse the board's decision merely because a contrary result may be permissible. *Burns v. City of Des Peres*, 8 Cir. 1976, 534 F.2d 103, *cert. denied* 1976, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139; *Capital Properties, Inc. v. Zoning Commission of District of Columbia*, D.C.D.C.1964, 229 F.Supp. 255. Nor is it to assume the role of a "super-zoning board." *Sixth Camden Corp. v. Evesham*, D.C.N.J.1976, 420 F.Supp. 709; *Steel Hill Development, Inc. v. Town of Sanbornton*, 1 Cir. 1972, 469 F.2d 956, 960; see *Village of Belle Terre v. Boraas*, 1974, 416 U.S. 1, 13, 94 S.Ct. 1536, 1543, 39 L.Ed.2d 797. The actions of local zoning boards are entitled to a presumption of validity. *South Gwinnett v. Pruitt*, 5 Cir. 1973, 482 F.2d 389, rehearing en banc, 1974, 491 F.2d 5, 7, *cert. denied*, 1974, 419 U.S. 837, 95 S.Ct. 66, 42 L.Ed.2d 64; *Turnpike Realty Co. v. Dedham*, 1972, 362 Mass. 221, 233, 284 N.E.2d 891, *cert. denied*, 1973, 409 U.S. 1108, 93 S.Ct. 908, 34 L.Ed.2d 689. Our sole

---

**2.** In their original motion for a preliminary injunction filed on November 19, 1981, plaintiffs requested a broader injunction "restraining defendants from preventing plaintiffs from selling their remaining 49 lots, so long as said lots contain a covenant against being built upon without permits issued by the Town of Edgartown." Plaintiffs' substitute motion represents their effort to parry various objections to their original motion made by defense counsel at oral argument.

**3.** Plaintiffs have apparently waived any statutory claim that the Edgartown Planning Board and Zoning Board of Appeals exceeded their authority under the Massachusetts Zoning Enabling Act. At oral argument this court inquired into the propriety of abstention in this case. Plaintiffs' counsel informed us that plaintiffs originally had brought an action pursuant to M.G.L. c. 40A, § 17, in the Superior Court of Dukes County appealing from the Zoning Board of Appeals' denial of a special permit. Upon further investigation, however, counsel determined that the statutory claim lacked merit. Hence, plaintiffs moved to dismiss their action, with prejudice, on the day of the hearing before us.

function in this case is to determine whether the Planning and Appeals Boards' decision denying plaintiff Giuliano's application for a special permit was "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare." *Euclid v. Ambler Realty Co.*, 1926, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303; *Blackman v. City of Big Sandy*, 5 Cir. 1975, 507 F.2d 935; *South Gwinnett v. Pruitt, supra*, 491 F.2d at 7; *Cowart v. City of Ocala*, D.C.Fla.1979, 478 F.Supp. 774; *Sixth Camden Corp. v. Evesham, supra* at p. 722–23; *Stone v. City of Maitland*, 5 Cir. 1971, 446 F.2d 83, 87. Otherwise stated, our task is to determine whether there is *any* legitimate public purpose which rationally may be furthered by the Boards' application of Section 11.1 to plaintiffs' property.[4]

■ Plaintiffs argue the Board's application of Section 11.1 had two basic purposes: (1) to freeze or reduce prices so that the lots

in their subdivision could be purchased by year-round residents of Edgartown and (2) to monitor population growth in order to insure that public facilities and services in Edgartown were not overtaxed. They argue that the application of the by-law to their property was unconstitutional because: (1) the first purpose was not a legitimate public goal for the town to pursue and (2) the second purpose, which is assumed to be valid, could have been furthered merely by restricting the granting of building permits.

Upon consideration of the evidence presented thus far, plaintiffs have not shown a likelihood that they will prevail on either of their theories. Defendants have presented considerable evidence, in the form of affidavits, to support their position that the application of Section 11.1's limitation on the timing of subdivision sales was reasonably related to the fulfillment of a

4. At oral argument, plaintiffs took the position, without citing any authority for it, that in reviewing the constitutionality of Section 11.1, as applied in this case, this court may consider only the reasons cited by the Planning Board in its denial of Giuliano's application for a special permit to determine the purpose behind the by-law's application. We reject plaintiffs' position for two reasons. First, we doubt its validity as a matter of law. The United States Supreme Court has held that the standard of review to be applied to a constitutional challenge under the due process clause is to be determined by the nature of the right assertedly threatened rather than by the power being exercised or the specific limitation imposed by authorities. *Schad v. Borough of Mount Ephraim*, 1981, 452 U.S. 61, 101 S.Ct. 2176, 2182, 68 L.Ed.2d 671. In this case, plaintiffs are asserting violations only of property rights, not fundamental rights. The traditional standard of review in due process cases involving only property rights is the "minimum rationality" standard. Under this standard, *any* plausible permissible purpose which may rationally be furthered by a challenged by-law is sufficient to support its constitutionality. *Sixth Camden Corp. v. Evesham, supra* at p. 723; *Sturges v. Chilmark*, 1980, 380 Mass. 246, ——, Mass.Adv.Sh. 815, 825, 402 N.E.2d 1346. The fact that this case challenges the constitutionality of a zoning by-law as applied, instead of on its face, does not change the relevant standard of review.

Second, the adoption of plaintiffs' position could lead to an unjust result, given the unique factual circumstances of this case. Plaintiff

Giuliano originally applied for and was denied a special permit under *subsection c* of Article XI, Section 11.1. That subsection refers only to "subdivisions" not conveyances and authorizes the Board to grant a special permit only upon a determination that the probable benefits to the town of such a grant outweigh its probable adverse effects. Yet plaintiffs' constitutional challenge is primarily directed at *subsection b* of Section 11.1 which allows subdivisions of more than 10 lots per year provided the landowner covenants with the Planning Board "that he will not *convey or build* upon more than 10 lots in any 12 month period." Article XI, Section 11.1(b). The only alleged basis of plaintiffs' standing to challenge the reasonableness of Section 11.1(b)'s restriction on the timing of conveyancing as applicable here, seems to be a discussion which occurred at the hearing before the Zoning Board of Appeals, *after* the Planning Board had already denied Giuliano's application, in which plaintiffs' counsel stated that his client wanted to sell his lots but was willing to covenant that he would not build upon more than 10 of them per year. *Ante*, at pp. 1079–1080. Until that discussion, plaintiff had sought permission both to convey and to build upon his proposed lots. And the Planning Board, faced with such an application, quite appropriately cited as grounds for its decision the adverse effects which could be expected to flow primarily, although not exclusively, from a decision to permit building, as opposed to conveyancing.

legitimate public purpose, viz., to monitor subdivision planning and growth and thereby ensure the adequate provision of municipal services and orderly development beneficial to the community as a whole. Since 1978 Edgartown has experienced rapid and extensive subdivision development and growth.[5] In 1978, 130 lots in the town were subdivided. Affidavit of Planning Board member Cynthia Meisner, p. 2. In 1979, the number of lots subdivided climbed to 495.[6]

According to uncontested portions of affidavits filed by defendants, several problems arose as a result of this rapid development. First, developers of subdivisions had little incentive to ensure high quality workmanship and materials in the construction of roads and other prerequisites to conveyancing since they were no longer subject to the town's regulations once they sold all of their lots. In at least two large subdivisions, the roads constructed by developers began to erode soon after all of the lots had been sold but prior to any substantial development of the lots or organization of homeowners' associations. The dilemma for the town was that no parties were present to repair the deterioration since the developers were no longer on the scene to assume responsibility and lot owners (most of whom were nonresidents of the town) were unavailable or unable to remedy the problem.

Another consequence of the rapid conveyancing was that residents of the town began to experience rising consumer costs for services and utilities. For each new subdivision, utilities (water pipes, etc.) were extended throughout the subdivision prior to any development. After the lots were conveyed, a number remained undeveloped and therefore generated no user fees to cover the maintenance costs attributable to their utility lines. Such costs had to be borne instead by the town's residents.[7]

A third consequence of the town's unlimited growth pattern was an increased demand for public services and facilities, which required the hiring of additional personnel at the same time that the town was faced with fiscal constraints imposed by Proposition 2½. This drain on public services and facilities was felt even when subdivided parcels were not developed. As the Assistant to the Planning and Personnel Boards of Edgartown explained:

> Whether parcels of property are built upon or not, their proliferation and rapid transfer ... create financial burdens for the town .... The town is being squeezed between growth-related demands on its budget (which increased from $1,572,000. in 1976 to $2,756,000. in 1981) and the constraints of Proposition 2½ with the result that unrestricted growth in subdivisions and lot sales pose a serious municipal concern. Affidavit of Dianne Durawa, at page 2.

Finally, the town had experienced numerous problems with its water supply which further cautioned against overly rapid growth. According to one Planning Board member, in those areas in which too many private wells had been dug, undue demands on the water table had rendered the wells vulnerable to salt water intrusion. In other areas it appeared that salt leaching into

---

5. The defendants attributed much of this growth to Edgartown's withdrawal in 1978 from the Martha's Vineyard Commission. They allege that as a result of such withdrawal, land in the town became a target for acquisition by developers seeking to avoid the additional development and approval process imposed by the MVC. Plaintiffs disputed defendants' attribution.

6. In 1979, the number of existing lots in the town was approximately 3,350. Today that figure has nearly doubled, and it is estimated that there will be 7,000 lots by 1983. The volume of property transfers has also increased

from an annual rate of approximately 300 in 1978 to 600 in 1981. Affidavit of Dianne Durawa, Assistant to the Edgartown Planning and Personnel Boards, filed January 18, 1982, at p. 1.

7. The Edgartown Water Company was recently granted a large partial rate increase by the State Department of Public Utilities. The company stated that the increase was partially necessitated by the extension and necessary servicing of water lines in expanding subdivisions. Affidavit of Cynthia Meisner, at p. 3.

ground waters had rendered the land unsuitable for private wells.[8]

Given these problems, town officials felt a need to enact a rational system of growth controls. A team of land use planners were called in to help it develop a by-law provision restricting subdivision growth. After careful study, the town chose to adopt § 11.1, a limitation on the timing of subdivision development, rather than a more restrictive control such as a growth moratorium. According to the affidavit of Thomas Wallace, a member of the Edgartown Planning Board, the basic purpose of the restriction on the timing of conveyancing and the exception to such restriction found in Section 11.1(c) is:

> ... to encourage developers to devise attractive and well-conceived subdivision plans. By forbidding the subdivision of more than 10 lots unless the Planning Board is first convinced of the overreaching benefits of the plan, Article 11.-1(c) gives a developer of a large subdivision an incentive to prepare a superior proposal, since the developer will otherwise be forced to draw out the period over which he sells off (and continues to finance) the subdivision. A mere restriction on building permits would not have had this effect since it operates only on the lot purchaser while leaving the developer free to immediately sell off the lots.

Defendants have also shown that the application of Section 11.1's restriction on the timing of conveyancing was reasonably related to the public purposes to which it was directed. Specifically, they have presented evidence that Mr. Giuliano's subdivision proposal provided for high density development and limited open space, in contrast to "high quality" subdivision proposals submitted to the Planning Board by other developers since the by-law's enactment. They have also established that plaintiffs have not complied with a condition of Mr. Giuliano's permit for cluster development requiring him to provide three moderate income lots at prices equal to no more than ¼ of their fair market value in cash or ⅛ of their fair market value if mortgaged. In addition, a member of the Planning Board has averred that the currently required extension of town water lines to plaintiff's other 49 lots, which could not be built upon, would increase the utility costs borne by other customers of the Edgartown Water Company.

Plaintiffs have made no showing that the growth-related concerns defendants claim underlay their application of Section 11.1(c) to this case were false or illegitimate.[9] Nor have they offered any evidence which directly undermines defendant's showing of a rational relation between the application of Section 11.1's limitation on subdivision conveyancing and the monitoring and control

---

**8.** The town is currently soliciting bids for a comprehensive water quality study both to assess the town's water needs and protect potential lot purchasers from purchasing land with a contaminated water supply. One of the purposes of the study is to determine whether the town's zoning code needs to be revised in order to take account of the town's water supply problems.

**9.** Restraints on the timing of a municipality's subdivision development and growth have been upheld as valid exercises of the police power in other cases. See, e.g., *Construction Indus. Ass'n of Sonoma County v. Petaluma*, 9 Cir. 1975, 522 F.2d 897, *cert. denied* 1976, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 342; *Sturges v. Chilmark*, 1980, 380 Mass. 246, ——, Mass. Adv.Sh. 815, 825, 402 N.E.2d 1346; *Golden v. Planning Board of Ramapo*, 1972, 30 N.Y.2d 359, 334 N.Y.S.2d 138, 285 N.E.2d 291, *appeal*

*dismissed* 1972, 409 U.S. 1003, 93 S.Ct. 436, 34 L.Ed.2d 294; see generally Ellickson Suburban Growth Controls: An Economic and Legal Analysis, 86 Yale L.J. 385 (1977); Note, Phased Zoning: Regulation of the Tempo and Sequence of Land Development, 26 Stan.L.Rev. 585 (1974); Comment, The Limits of Permissible Exclusion in Fiscal Zoning, 53 B.U.L.Rev. 453 (1973); 1A. Ruthkopf, Zoning and Planning, § 13.05 (4 ed. & Supp.1980). The rate of development by-law involved in *Sturges, supra,* restricted only the timing of building permits and not conveyancing within subdivisions in the Martha's Island town of Chilmark. Nevertheless, many of the considerations outlined by the Massachusetts Supreme Judicial Court to support its conclusion that the Chilmark by-law represented a valid exercise of the police power apply with equal force to the by-law involved in this case.

of subdivision growth and development in this case.[10]

Finally, they have offered no evidence to show that the benefits of their proposed subdivision exceeded its adverse effects, or even that there were benefits to the town to be derived from it. Thus, we believe, at least on the basis of the evidence presented thus far, that plaintiffs will not be able to prove that the sales limitation was applied to their property for an impermissible non-public purpose.

■ Plaintiffs' argument that defendants' application of the by-law's sales limitation was unconstitutional even if it were intended to accomplish the valid public purpose of limiting population growth has two weaknesses. First, on the basis of the evidence presented thus far, we cannot say that defendants' growth-related concerns were related solely to increases in the town's population. Second, even if they were, we cannot say that the sales limitation could not rationally be expected to result in a decrease in the town's population. In an exercise of the police power affecting only property rights, a zoning board is not required to prove that it adopted the least restrictive means of accomplishing a legitimate public purpose or that the means adopted is perfectly consistent with the desired result. *Shell Oil Co. v. Revere*, 1981, —— Mass. ——, ——, Mass.Adv.Sh.

1285, 1290, 421 N.E.2d 1181; see *Williamson v. Lee Optical of Okla., Inc.*, 1955, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563, *rehearing denied*, 1955, 349 U.S. 925, 75 S.Ct. 657, 99 L.Ed. 1256. It need only show that the means adopted bore a rational relation to the legitimate public purpose. *Cowart v. City of Ocala, supra* at p. 784; *Shell Oil Co. v. Revere, supra* —— Mass. at p. —— at p. 1289, 421 N.E.2d 1181.

B. *The Taking Claim*

■ Plaintiffs likewise have failed to demonstrate a likelihood of success on the merits of their taking claim. In order to succeed on this claim, they must prove that the application of Section 11.1 does not substantially advance legitimate state interests or denies Ms. Lett economically viable use of her land. *Agins v. Tiburon*, 1980, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106; *Oceanic California, Inc. v. City of San Jose*, N.D.Cal.1980, 497 F.Supp. 962. We have already expressed our doubts that plaintiffs will be able to establish that the application of Section 11.1 to the land involved here does not advance legitimate state interests. We also doubt that they will be able to prove that Ms. Lett has been denied economically viable use of her land. Section 11.1 does not prevent her from selling her land. The fact that Mr. Giuliano was able to sell the land to Ms. Lett is good

10. Instead, plaintiffs have relied on the Planning Board's finding that plaintiffs failed to provide adequate low to moderate income lots in their proposed subdivision, and a comment made by a non-Board member, to argue that the purpose of the Board's action was to freeze property values impermissibly and thereby insure the purchase of property by year-round residents. The Board's finding that the proposed subdivision failed to provide adequate low to moderate income lots by itself does not render its decision unconstitutional. Subsection c of Section 11.1 expressly authorizes the Board to consider the impact of a decision to waive the 10 lot restriction on "housing for seniority and people of moderate income"; and plaintiffs have not challenged the validity of that provision on its face. Nor have they presented any authority for the dubious proposition that the provision of housing for persons of low to moderate income is an illegitimate goal for the town to pursue.

As for the comment of the non-Board member, plaintiffs have established that at the public hearing before the Board of Appeals, Mr. Ivo Meisner, Cynthia's husband, stated "that merely non-building is not the total problem. Because of rapid turnover of property, prices are up so high that Edgartowners cannot afford property in their own town." However, the statement of a non-Board member at a hearing held before the Board of Appeals *after* the Planning Board had already rendered its decision is hardly sufficient to prove that the Planning Board's decision was based on the allegedly "impermissible" consideration outlined in the statement. Even if it were, it would not render the Planning Board's decision unconstitutional so long as defendants made a showing of a rational relationship between their application of the by-law and a legitimate public purpose. See *South Gwinnett v. Pruitt, supra*, 491 F.2d at p. 7.

evidence of that. Nor does Section 11.1 prevent Ms. Lett from developing her property. All it does is regulate the rate at which she may subdivide her property into lots and thereafter sell them to others.

The only allegation plaintiffs have made to support their inverse condemnation claim is that the application of Section 11.1 to the property has reduced its value. However, this, by itself, is insufficient to establish that Ms. Lett has been deprived economically viable use of her land. Several courts have already held that a mere diminution in the value of land does not constitute a taking, even when such diminution is extreme. See, e.g., *Penn Central Transportation Co. v. New York City*, 1978, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631, *rehearing denied* 1978, 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198; *Oceanic California, Inc. v. City of San Jose, supra* at p. 976, and cases cited therein.

II *Irreparable Injury*

■ In order to obtain a preliminary injunction, plaintiffs must also demonstrate that in its absence, they will suffer irreparable harm and have an inadequate remedy at law. *Interco, Inc. v. The First National Bank of Boston*, 1 Cir. 1977, 560 F.2d 480. In their filings, they have alleged three types of injuries: (1) "lost profits from sales not made"; (2) "debt interest which would have been retired if sales had gone forward"; and (3) the cancellation of a $300,000 development loan from the First Federal Savings & Loan Association ("First Federal") to Ms. Lett to purchase Mr. Giuliano's property and to construct roads thereon. In our opinion, none of these alleged injuries warrants the exercise of this court's injunctive powers.

Any lost profits and additional debt interest incurred by plaintiffs can be adequately remedied by an award of damages should plaintiffs ultimately prevail in these proceedings. As for the outstanding development loan to Ms. Lett, the loan agreement between First Federal and Ms. Lett provides *inter alia* that the lender "shall reserve the right to cancel and to terminate its obligations under this commitment . . . if borrower is unable to obtain a final subdivision approval from the Town of Edgartown [by February 6, 1982]."

The affidavits of Mr. Leo LaPierre, Vice President of First Federal, indicate that the subdivision to which the loan agreement refers is the proposed cluster subdivision for which plaintiff Giuliano obtained only preliminary conditional approval on July 1, 1981; and that if Ms. Lett does not obtain final approval of such subdivision before mid-February 1982,[11] Ms. Lett's loan will "in all likelihood be called by the bank"; and if it cannot be paid, "the normal procedure . . . would be to institute mortgage foreclosure proceedings against the land which stands as security for [the] loan." Plaintiffs argue that if their motion for a preliminary injunction is not granted and foreclosure proceedings are commenced, Ms. Lett will suffer irreparable harm to her business as a developer.

We find, however, that the threatened cancellation of Ms. Lett's loan is not sufficient to support a finding of an "irreparable injury" in this case. The affidavits of Mr. LaPierre are tentative at best as to whether or not Ms. Lett's loan actually will be called in the event that a special permit is not obtained by March 26, 1982. Even if we assume that it will be, plaintiffs have made no showing that Ms. Lett will be unable to repay the loan.

Furthermore, it appears that Ms. Lett's alleged "irreparable injury" is, to a considerable extent, of her own making. She entered into the loan agreement involved here on August 12, 1981 with full knowledge that the Edgartown Planning Board had already denied Mr. Giuliano's application for a special permit. Indeed, at oral argument, plaintiff's counsel stated that Ms. Lett was able to purchase the property from Mr. Giuliano at a discount because of

---

11. The second affidavit of Mr. LaPierre, filed by defendants on January 18, 1982, indicates that this deadline may be extended to March 26, 1982 if this court grants the injunctive relief requested by plaintiffs.

the Planning Board's prior denial of the special permit. Hence it appears that the risk of cancellation of the loan was one Ms. Lett recognized and was prepared to accept at the time she entered into the loan agreement.

Moreover, all of the evidence presented suggests that Ms. Lett purchased the land involved here not to establish a personal residence on it but rather to subdevelop and sell it. Thus, even if she were to lose the land as a result of foreclosure proceedings and thereafter prevail on the merits of this case, her real "loss" would take the form of lost profits. As already noted, such lost profits could be adequately remedied by an award of monetary damages.

Finally, even if this court were to grant the preliminary injunction requested, it is by no means clear that Ms. Lett would be able to avoid foreclosure. The loan agreement itself refers to "final subdivision approval"; and as of December 29, 1981 neither plaintiff had submitted a definitive subdivision plan for plaintiffs' proposed subdivision. This court has received no notice of any such submission. Under M.G.L. c. 41, § 81U, once a definitive subdivision plan is submitted to the Planning Board for approval, the Board will have 60 days from the date of the plan's filing to render a decision approving, disapproving or modifying the plan. Thus, even if this court were to enjoin the application of § 11.1's limitation on conveyancing in this case, such injunction might be rendered nugatory by further inaction on the part of plaintiffs or further action by Edgartown's Planning Board.

Accordingly, plaintiffs' motion for a preliminary injunction is ordered denied.